200 So.2d 428 (1967)
TENNESSEE GAS TRANSMISSION COMPANY
v.
VIOLET TRAPPING COMPANY, Inc.
No. 2620.
Court of Appeal of Louisiana, Fourth Circuit.
June 5, 1967.
Rehearing Denied July 5, 1967.
*430 Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Ernest A. Carrere, Jr., New Orleans, and Shotwell, Brown & Sperry, Burt. W. Sperry, Monroe, for plaintiff-appellee.
John W. Bryan, Jr., New Orleans, for defendant-appellant.
Before McBRIDE, BARNETTE and JANVIER, JJ.
BARNETTE, Judge.
This is an expropriation proceeding brought by Tennessee Gas Transmission Co. for a right-of-way across a section of land owned by Violet Trapping Co., Inc., in Plaquemines Parish, Louisiana. Plaintiff seeks the right-of-way for the purpose of laying a 36-inch high pressure gas pipeline. This pipeline will be used to transmit natural gas from the point of production in the coastal area of Louisiana to the consuming public in certain northeastern states.
Judgment was read, signed and filed on September 21, 1964, in plaintiff's favor granting the right of expropriation and fixing compensation for the property taken and damages in the amount of $2,877.19. Suspensive appeal was sought and denied by the trial judge under the authority of LSA-R.S. 19:13 as amended by Act 108 of 1960. With reservation of rights under its petition for suspensive appeal, defendant petitioned for, and was granted, a devolutive appeal. It is on that appeal that the case is now before us.
When its petition for suspensive appeal was denied, defendant applied to this court for writs of mandamus and prohibition. On November 13, 1964, this court, in proceeding No. 1741 on our docket, denied writs with the following per curiam:
"Writs refused.
The application is denied. There is no constitutional guarantee of a suspensive appeal, and the act of the legislature in limiting appeals in expropriation cases to devolutive appeals is not unconstitutional."
Writs were then applied for and granted to the Supreme Court limited to the question of constitutionality of LSA-R.S. 19:13 and LSA-C.C. arts. 2634 and 2636 as amended by the acts of the Legislature of 1960 (Acts 92, 93, and 108). The Supreme Court, on rehearing, held the acts constitutional. See Tennessee Gas Transmission Co. v. Violet Trapping Co., 248 La. 49, 176 So.2d 425 (1965).
The facts and the issues raised by defendant's exceptions and answer were accurately stated in the foregoing opinion of the Supreme Court and will not be repeated here. As indicated, that Court's decision did not dispose of the merits of the case, to which we will now address ourselves.
Plaintiff is a "natural gas company" within the meaning of the Natural Gas Act (15 U.S.C.A. § 717 et seq.). It is engaged in the business of interstate transportation of natural gas by means of pipelines to the consuming public in many states and enjoys the right of expropriation in accordance with the provisions of 15 U.S.C.A. § 717f(h) and LSA-R.S. Title 19. It does not appear that this authority is challenged by defendant; but defendant does strongly contend that the Certificate of Public Convenience and Necessity issued by the Federal Power Commission, July 13, 1964, upon which plaintiff relies for its authority to construct the pipeline in question, is invalid.
Defendant further contends that plaintiff has already acquired the necessary right-of-way across its property by an agreement dated August 12, 1958, and that under this agreement plaintiff is obligated to construct the proposed pipeline on the right-of-way acquired by that agreement. On this premise defendant argues that there is no necessity for a further taking of its property.
These are the principal issues of contention which must be disposed of before consideration can be given to such matters as *431 compensation, severance and consequential damages, and other incidental issues.
The defendant's attack on the validity of the Certificate of Public Convenience and Necessity is based on the contention that it was issued without notice to defendant and that a hearing, as required by law, was not had on its application. The merits of this contention cannot be considered by us. Our Supreme Court has clearly held that our courts will not entertain an attempt to attack collaterally an order of the Federal Power Commission.
In Texas Eastern Transmission Corp. v. Bowman, 238 La. 399, 115 So.2d 797 (1959), the Supreme Court said:
"Concededly, plaintiff corporation was organized for the purpose of, and it engages in, the transporting and marketing of natural gas for public consumption on an interstate basis. And the conducting of its business is, pursuant to an act of Congress adopted June 21, 1938 (U.S.C.A. Title 15, Section 717 et seq.), subject to regulation exclusively by the Federal Power Commission. See Illinois Natural Gas Co. v. Central Illinois Public Service Co., 314 U.S. 498, 62 S.Ct. 384, 86 L.Ed. 371. Hence, it is seriously doubted that we could justifiably question or disregard the order of the Commission (apparently subjected to a collateral attack here by appellants) which recited that it was necessary and desirable in the public interest to permit the installation and operation of the instant interconnecting line, particularly since the mentioned congressional enactment declares that the right to a judicial review of the Commission's orders shall be vested in the federal courts. See 15 U.S.C.A. § 717r; Graziani v. Elder & Walters Equipment Co., Inc., 209 La. 939, 25 So.2d 904; Parkes v. Natural Gas Pipe Line Co. of America, 207 Okl. 91, 249 P.2d 462, 73 C.J.S. verbo Public Administrative Bodies and Procedure § 174, p. 516; and Home Gas Co. v. Eckerson, 197 Misc. 793, 94 N.Y.S.2d 221." 238 La. at 406, 115 So.2d at 799. This authority was cited and followed in Texas Eastern Transmission Corp. v. Bowie Lumber Co., 176 So.2d 735 (La.App. 1st Cir. 1965). There the court said:
"Plaintiff in support of its right and authority to expropriate the property in question introduced into evidence the order of the Federal Power Commission. This order, dated December 19, 1963, contains the certificate of public convenience and necessity. Additionally, testimony was offered by plaintiff to explain the nature of its business, as well as the purpose for which the pipe line would be used. We have carefully examined the contention and position of the defendant in respect to its position that plaintiff lacks expropriation authority. We fail to find anything in this position that merits a detailed discussion. The defendant attacks this right of plaintiff in the vein that the order of the Federal Power Commission is of no effect because the Commission did not hold a formal hearing on plaintiff's application. Suffice it to say that this is a collateral attack on the order of a federal agency and even if it could be a subject of collateral attack, which we hold is not possible under the authority of Texas Eastern Transmission Corporation v. Bowman (1959) 238 La. 399, 115 So.2d 797, any attack on an order of a federal agency must be brought in a federal court.
"Filed in evidence is a certified copy of the order of the Commission. On its face it appears to be regular and in conformity to the regulatory requirements of the Natural Gas Act, supra.
"Furthermore, an order of the Federal Power Commission carries with it a presumption of validity. In 73 C.J.S. Public Administrative Bodies and Procedure § 145, p. 478, the rule is stated as follows:
`As a general rule, the decisions or orders of an administrative body are, in the absence of evidence to the contrary, presumptively correct and valid.

*432 Thus there is a presumption that legal duties and statutory requirements were complied with, that facts justifying a ruling were in existence, and that there was sufficient evidence on which to base the decision of the agency. * *'" 176 So.2d at 737-738.
In addition to its attack on the validity of the Certificate of Public Convenience and Necessity for alleged want of notice, defendant argues that plaintiff should have been required to prove that it had complied with all conditions of the certificate before being permitted to proceed with expropriation. The pertinent paragraphs of the certificate are as follows:
"(A) A certificate of public convenience and necessity be and the same is hereby issued authorizing Applicant, Tennessee Gas Transmission Company, to construct and operate the proposed facilities and to sell and deliver natural gas as hereinbefore described, all as more fully described in the application in this proceeding, upon the terms and conditions of this order.
"(B) The certificate issued by paragraph (A) above and the rights granted thereunder are conditioned upon Applicant's compliance with all applicable Commission Regulations under the Natural Gas Act and particularly the general terms and conditions set forth in paragraphs (a), (b), (c) (1), (c)(2), (c) (3), (c) (4) and (e) of Section 157.20 of such Regulations."
Any complaint which defendant might have of plaintiff's failure to comply with the conditions upon which the authority was granted should be addressed to the Federal Power Commission. It must be assumed that the Commission is fully capable of enforcement of its own orders. Furthermore, defendant has failed to point out which conditions have not been met, or wherein the authority of the Commission has been violated. Finally, this also is a collateral attack on the validity of the certificate which will not be entertained for the reasons stated above. Defendant cites Town of South Tucson v. Tucson Gas, Electric & Pow. Co., 149 F.2d 847 (1945), as authority for its contention. We are of the opinion that the Tucson case does not apply to the facts before us. No order of a federal commission was involved in that case. The federal court deciding the case had obtained jurisdiction on diversity of citizenship grounds, and its decision was based on the substantive law of Arizona. In that State the performance of the statutory conditions precedent to exercising the power to condemn is held to be essential to the court's jurisdiction to proceed with the litigation. This must be shown by the party seeking condemnation. In Arizona the question may be determined in the condemnation suit by a collateral attack by the property owner. Such is not the law in Louisiana in regard to an order by a federal commission. The numerous cases cited in defendant's brief, found in a footnote to the Tucson case, all involve the substantive law of states similar to that of Arizona and have no application to the facts before us.
The other issue, upon which the defendant challenges the right of the plaintiff to expropriate the proposed right-of-way, emanates from the following factual situation. In a prior expropriation proceeding, No. 4624 on the docket of the Twenty-Fifth Judicial District Court for the Parish of Plaquemines, filed May 5, 1958, the plaintiff, Tennessee Gas Transmission Company, sought a right-of-way across this same section of defendant's property. The plaintiff obtained judgment and the defendant appealed. While appeal was pending, plaintiff and defendant settled their differences by contract, and the appeal was dismissed. By their contractual agreement, dated August 12, 1958, plaintiff was granted the right-of-way for a stated sum (being double the sum awarded by the court) and certain considerations relative to construction. It is clearly indicated by the terms of the agreement that the need of a second pipeline was *433 anticipated, for the contract contains the following paragraph:
"It is understood that the first pipeline to be constructed across the above described property will be constructed within six months from the date of this instrument and that it will be necessary to dredge a canal approximately forty feet (40') in width for the purpose of constructing said line, and that the second line to be constructed will be laid in the same canal as the first line."
Defendant places great stress on the words "and that the second line to be constructed will be laid in the same canal as the first line." It argues from this that there is no necessity for an additional right-of-way and that plaintiff is contractually obligated to place its proposed 36-inch line in the existing canal wherein its 30-inch line was laid under the 1958 agreement.
Clearly the plaintiff has the right under the foregoing agreement to place its proposed pipeline in the existing canal. However, the question is whether the plaintiff by the agreement contracted away its right of future expropriation of an additional right-of-way in the event sound engineering principles should then indicate it to be a better plan of construction. Without reviewing the uncontradicted testimony of the engineering experts, we find that while it is possible to lay the proposed 36-inch line in the same canal with the 30-inch line, it would not be a sound engineering procedure. The uncontradicted opinions of the engineers are that it should be laid in an entirely separate canal. However, aside from the question of engineering principles, there is an important legal question to be consideredwhether such an agreement is enforceable against the public interest.
The term "expropriation" used in our statutes is practically synonymous with the term "eminent domain." Expropriation means the right to take private property for public purpose and utility upon the payment first of just compensation. It is based on the sound legal principle so well stated in LSA-C.C. art. 2626 in the following words:
"The first law of society being that the general interest shall be preferred to that of individuals, every individual who possesses under the protection of the laws, any particular property, is tacitly subjected to the obligation of yielding it to the community, wherever it becomes necessary for the general use."
This right, which had its origin in the inherent power of government, has been extended by statute to private corporations serving a public purpose. With this fundamental concept in mind it is immediately obvious that a public utility, which enjoys the right of expropriation by virtue of its serving public purposes, cannot contract away that right granted to it by law for the public benefit. We therefore hold that the plaintiff acquired the right by the contract of August 12, 1958, to lay its second pipeline in the first canal without the payment to defendant of additional compensation, but that it did not and could not contract away its power of expropriation. It may take, according to law and for a just compensation first paid, additional land of defendant for the construction of its new pipeline, irrespective of the agreement of August 12, 1958. Woods Irr. Co. v. Klein, 233 P.2d 48 (105 C.A.2d 266, 233 P.2d 48, 1952); Lay v. Pi Beta Phi, Inc., 207 S.W.2d 4 (30 Tenn.App. 423, 207 S.W.2d 4, 1947); Central Hanover Bank & Trust Co. v. Pan American Airways, 137 Fla. 808, 188 So. 820 (1939); Freeport Brick Co. v. Equitable Gas Co., 279 Pa. 425, 123 A. 783 (1924); Russell v. Trustees of Purdue Univ., 93 Ind.App. 242, 178 N.E. 180 (1931); C. & W.I.R.R. Co. v. I.C.R.R. Co., 113 Ill. 156 (1885); Cape Girardeau & Scott County Macadamized Road Co. v. Dennis, 67 Mo. 438 (1878).
However, this right of expropriation is not one to be exercised arbitrarily and capriciously to merely serve the convenience of the condemnor. There is a *434 presumption that the authority has been exercised honestly and a route selection made within the discretion of the expropriating authority in the light of experience and sound engineering principles. This presumption is subject to attack by the defendant and will fall if it can be shown that it was exercised fraudulently or in bad faith, or if it amounts to an abuse of the privilege of expropriation. Texas Eastern Transmission Corp. v. Bowie Lumber Co., supra, Central Louisiana Electric Co. v. Covington & St. Tammany Land & Improvement Co., 131 So.2d 369 (La.App. 1st Cir. 1961).
There is nothing in the record before us to indicate that the plaintiff Tennessee Gas Transmission Co. has done anything to destroy the presumption granted to an expropriating authority in its selection of the route for the proposed pipeline, the requirement of a second right-of-way, or the amount of property needed for its purpose.
This brings us to the consideration of the factual issues presented relative to compensation for the land taken and consequential damages. On these questions we find the evidence to preponderate in support of the judgment rendered. There is certainly no manifest error in our opinion.
The permanent right-of-way will consist of a canal across defendant's property 50 feet wide, lying parallel to and 100 feet (measured from center to center) east of the existing right-of-way granted in 1958. The total area will comprise 5.685 acres. In addition to the canal, plaintiff seeks a 50-foot strip on both sides of the canal each containing a like number of acres on which the spoil from the excavated canal will be deposited during construction. Plaintiff's expert appraisers, John M. Parker III and John F. Carrere, agreed with defendant's appraiser Omer F. Kuebel that the 50-foot strip on the west side of the canal will have little or no value and that compensation for that strip should be on the basis of total loss to defendant. It was estimated that the 50-foot strip on the east side of the canal will be damaged from 10 to 50 percent of its value.
Defendant's property is salt water marshland consisting of approximately 60 percent land and 40 percent water. Its highest and best use according to plaintiff's two expert appraisers is speculative marshland. Defendant's appraiser said its value was in fishing, hunting and trapping. Plaintiff's appraisers fixed its value on the basis of known comparables at $100 and $125 per acre respectively and defendant's appraiser at $150 per acre. On the basis of these appraisals, the value of the 5.685 acres to be used by the canal was fixed at $568.50, $710.62, and $852.75, respectively. Like amounts were fixed by Parker and Carrere for the 50 feet (5.685 acres) on the west side lying between the two canals, which, as stated above, they agreed would have no further practical value to defendant. On the damage to the 50 feet (5.685 acres) on the east side of the canal plaintiff's witnesses agreed upon a 10-percent damage ($56.85 and $71.06 respectively). Defendant's expert fixed the damage to the spoil area on the east side at $75 per acre (50 percent of his appraisal) which would amount to $426.38. Defendant's witness Kuebel was of the opinion that all the land between the two canals would eventually be lost by erosion and, after correcting his original estimate based on an error as to the exact acreage, fixed the damage for that loss at $1,500. The total figures of the three experts for the land taken and damage were: Parker, $1,193.85 (rounded off at $1,200); Carrere, $1,492.30; and Kuebel, $3,205.53. The amount awarded by the trial court was $2,877.19.
The defendant complains of alleged error by the trial judge in refusing to admit in evidence certain offers and purchases by plaintiff of rights-of-way from other landowners in the general area. Offers of purchase and purchases made under necessity to avoid litigation are not *435 competent evidence for determining market value. Sales to an expropriating authority made under threat of expropriation are not the result of free bargaining between a willing buyer and a willing seller, and while they can be considered in reaching the market value of the property to be expropriated, they are not controlling as comparable sales. State, Department of Highways v. McDuffie, 240 La. 378, 123 So.2d 93 (1960); State, Dept. of Highways v. Vallon, 182 So.2d 705 (La.App. 4th Cir. 1966); Gulf States Util. Co. v. Norman, 183 So.2d 421 (La.App. 3d Cir. 1966).
In expropriation proceedings, offers to purchase or lease the expropriated property, even though bona fide, are inadmissible as evidence of market value. State v. McDuffie, supra, Louisiana Ry. & Nav. Co. v. Morere, 116 La. 997, 41 So. 236 (1906). We find no error in the ruling of the trial court on this question.
The defendant does not seriously challenge this award insofar as it compensates for the acreage taken and that damaged by spoil. It does, however, vigorously assert its claims for consequential damages not included in the above figures. These items of damage rejected by the trial court are for damage to the muskrat trapping potential on the subject property and for the cost of installing revetments to stabilize the canal banks. According to defendant's witnesses, two contractors with experience in revetment construction, the cost would be from $33.90 to $40.20 per foot. It was estimated that 2,041 feet of revetment would be necessary for which defendant demands $69,189.90. An additional sum of $7,805 is demanded for a canal plug to check the flow of water and thus reduce erosion.
The testimony of the witnesses has convinced us that the muskrat trapping potential on the subject property has been on the decline since the early 1950s and that by 1958 it was practically nil. Witnesses Emil Perez, Samuel Nunez, Norsez La Font, and Tony Guerra, experienced trappers who are familiar with the defendant's property, testified that there are no muskrats or that they are so few in number that there is no muskrat trapping activity in the vicinity. In past years the yield was high and trapping profitable, but conditions have changed and there is now no commercial value in trapping in that area.
The changes taking place are partly explained by defendant's witness Dr. Leslie L. Glasgow, Professor in the School of Forestry and Wild Life Management of Louisiana State University. He testified that the area is a highly brackish marsh and moving toward salt water. Glasgow stated that in this area the marsh is "sinking" and muskrats are on the decline. He testified, however, that muskrats are cyclic in nature and that they would return when conditions become more favorable. Glasgow recommended canal plugs or weirs to control the flow of water to retard the changes taking place.
Defendant's witness Kuebel, who considered the highest value to be trapping, hunting and fishing, conceded that the trapping value had been practically nil for several years.
Therefore, we must conclude that the defendant has failed to establish any basis for the allowance of damages for reduction of potential muskrat production. It is highly speculative and doubtful that the pipeline canals will have any effect on muskrat yield of the property which, evidently, was reduced by natural causes to a point below commercial value before the dredging of the first canal.
On the subject of revetments or bulkheads to control erosion and retard the natural changes taking place, defendant relies principally on the testimony of Dr. Glasgow and Mr. Lewis G. Nichols, Assistant Curator, Geology Museum, Louisiana State University. They testified on the extent of erosion taking place along the first canal and their speculation on the acceleration to be expected from the second canal.
*436 Dr. Glasgow recommended bulkheads to reduce erosion, but said plugs properly installed would greatly reduce this necessity. He stated that the changes taking place will be accelerated with the opening of the additional canal; and while construction of plugs and bulkheads (revetments) would retard, they would not, in his opinion, arrest the movement toward salt water marsh. Dr. Glasgow conceded that the change would be inevitable, no matter what actions were taken. On cross-examination, Dr. Glasgow would not say categorically that he would recommend the investment of the high cost of revetments in view of the inevitable and ultimate change he foretold.
On this subject the plaintiff presented the testimony of George W. White, its chief engineer, who qualified as an expert on marshland pipeline construction and maintenance. He testified that the property is subject to tidal overflow and is frequently inundated. Dr. Glasgow testified to this also. Mr. White said that the inundation from tides averages 11 days per month from June to October. He also mentioned the frequency of hurricanes which bring in extremely high tides causing serious erosion. Mr. White described the highly brackish condition of the marsh, and stated that there is a rising gulf all across coastal South Louisiana. This seems to corroborate Dr. Glasgow, who testified that the marsh is "sinking." Mr. White concluded from these facts that revetments would be of no practical value, since they would frequently be inundated and eventually destroyed by the force of hurricane tides.
We have not failed to consider evidence indicating that the first canal is now considerably wider at certain points than when dredged in 1958. Nor have we overlooked the testimony of Mr. Nichols and others that the erosion between the two canals might eventually destroy the middle land area, resulting in one wide canal. Whatever complaint the defendant might have that the widening of the first canal has resulted from fault of the plaintiff, does not address itself to the court in this expropriation proceeding. If in the future it should develop that defendant's property is damaged by some fault of the plaintiff a possibility too remote, uncertain, and speculative for present considerationthe defendant may then have recourse to the courts in a proper proceeding according to law. At that time it can be determined if the damage is the result of plaintiff's fault or the result of natural elements.
There are no reasons for judgment in the record before us, but from the fact that the trial judge made no allowance of damages for revetment construction, we must assume that he rejected defendant's demand upon a factual finding that the claim was not supported by the evidence. We find no error in that conclusion. The burden of proof of consequential damages is upon the defendant landowner who must discharge the burden by a preponderance of the evidence and to a legal certainty. The defendant has not discharged that burden. LSA-R.S. 48:453; State, Through Department of Highways v. Levy, 242 La. 259, 136 So.2d 35 (1961); Gulf States Util. Co. v. Hatcher, 184 So.2d 326 (La.App. 1st Cir. 1966); State, Dept. of Highways v. Reuter, 175 So.2d 316 (La.App. 4th Cir. 1965); State, Dept. of Highways v. Cannon, 159 So.2d 49 (La.App. 1st Cir. 1963).
The plaintiff's having made an offer in excess of the amount awarded by the court for compensation and damages, the trial court cast the defendant for the costs of court. We find no error in this. LSA-C.C. art. 2638; LSA-R.S. 19:12.
The judgment appealed from is affirmed at defendant-appellant's cost.
Affirmed.